**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

CLARISSA K. WILLIAMS,

        Plaintiff,

    v.                                CAUSE NO.: 2:21-CV-202-TLS

BRANDON WAKELEY and LLOYD
JEFFREY ELDRIDGE,

        Defendants.

**OPINION AND ORDER**

This lawsuit arises out of bite injuries Plaintiff Clarissa K. Williams sustained from Defendant Officer Lloyd Jeffrey Eldridge's K-9 partner during a police investigation following a 911 call of a burglary in progress of an unoccupied apartment. In the Second Amended Complaint, the Plaintiff brings Fourth and Fourteenth Amendment federal constitutional claims under 42 U.S.C. § 1983, alleging an excessive force claim against Officer Eldridge (Count I) and a failure to intervene claim against Officer Wakeley (Count II). This matter is now before the Court on the Defendants' Motion for Summary Judgment [ECF No. 36], which is fully briefed. For the reasons set forth below, the Court grants in part and denies in part the motion on the claims against Officers Eldridge and Wakeley and denies the motion as to punitive damages.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's

claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## MATERIAL FACTS[1]

On July 2, 2019, Jacob H. Barnes, the maintenance manager of an apartment complex in Crown Point, Indiana, made a 911 emergency call to the City of Crown Point Police Department to report that a Black female entered the back door of a vacant apartment in the complex and that

---

[1] The Plaintiff objects that numerous paragraphs of the Defendants' Statement of Material Facts violate Northern District of Indiana Local Rule 56-1(e) by not citing numbered paragraphs or page numbers. *See, e.g.*, ECF No. 43 at ¶ 4. Indeed, "[t]he court may find a fact is not supported if the citation does not include a page or paragraph number to evidence in the record . . . ." N.D. Ind. L.R. 56-1(e). Here, given the small number of exhibits, that most of the Defendants' facts are supported by the cited police incident reports, and the Court's preference for a decision on the merits, the Court exercises its discretion and considers the Defendants' Statement of Material Facts to the extent the facts are supported by readily identifiable portions of the cited evidence. However, counsel for the Defendants are cautioned that a future failure to provide a page or paragraph number for each citation may result in the wholesale disregard of the cited facts; providing the citations in the reply brief is too late.

no one should be inside. Ex. 2 at 3, 6.[2] The Plaintiff alleges that she was invited inside the apartment by Aaron Harper, who told her he had moved in that day. Second Am. Compl. ¶ 7, ECF No. 26; Ex. 1, 71:18–21; Ex. 2 at 4; Ex. 3 at ¶ 4.[3] In fact, Mr. Harper did not have a legal basis to occupy or enter the apartment. Second Am. Compl. ¶ 8; *see also* Ex. 2 at 4, 5.

Officers Lloyd Jeffrey Eldridge and Brandon Wakeley were among the City of Crown Point Police Department Officers who responded to the 911 dispatched burglary-in-progress call at the apartment. Exs. 2, 4. Upon arrival, Officers Eldridge and Wakeley spoke with Mr. Barnes, who informed them he had seen a heavyset, Black female enter though the back door of the vacant apartment; the apartment should not have anyone in it, which he had confirmed with the property manager; and the apartment had to have been broken into to be accessed. Ex. 2 at 3–4; Ex. 3 at ¶ 2; Ex. 4 at 3. Mr. Barnes told the officers that the "front door was opened," which the officers confirmed as they approached the apartment. Ex. 1, 44:10–13. Officer Wakeley did not see signs of forced entry in the rear or at the front door. *Id.* at 44:14–16. Officer Eldridge did not see any sign that any objects had been removed from the apartment, that anyone inside the apartment had a weapon, or of a forced entry. Ex. 5, 58:9–17. There was daylight throughout the officers' response to the 911 call. Ex. 1, 41:25–42:1.

Three officers took a position at the rear door of the apartment. Ex. 2 at 4; Ex. 4 at 3. Officer Eldridge, with his K-9 partner Bandit, Officer Wakeley, and two other officers took positions at the open front door. Ex. 2 at 4; Ex. 4 at 3. Officer Eldridge and at least another officer had their guns drawn. Ex. 5, 58:18–23. Officer Eldridge, the highest-ranking officer present, felt this was an appropriate response to the dispatch. *Id.* at 59:4–9.

---

[2] All exhibits were submitted by the Defendants and are located at ECF Nos. 36-1 through 36-5.
[3] The Court overrules the Defendants' hearsay objection because Mr. Harper's statement is not being offered to prove that Mr. Harper moved in that day but to show its effect on the Plaintiff.

Officer Eldridge made the announcement "Police Department K-9 Come Out With Your Hands Up" two times. Ex. 4 at 3; *see also* Ex. 2 at 4. Officers Eldridge and Wakeley then saw a Black male, later identified as Mr. Harper, peer around the corner of the wall just inside the apartment. Ex. 2 at 4; Ex. 4 at 3; Ex. 5, 59:10–60:13. Officer Wakeley could not see the man's hands, Ex. 2 at 5, and Officer Eldridge could only see the man's right hand and that he was not wearing a shirt, Ex. 4 at 3. The man was told twice in a loud, clear voice, "Show Me Your Hands." *Id.*; *see also* Ex. 2 at 4. Without showing his hands, the man "took off quickly" back into the apartment. Ex. 4 at 3; *see also* Ex. 2 at 4. Officer Eldridge wrote in his report: "For the safety of Officer's[sic] involved not knowing if the male subject had a weapon I yelled for him to stop and released my K-9." Ex. 4 at 3; *see also* Ex. 2 at 4. When asked if he reasonably expected that the K-9 would engage "Mr. Harper" after being given the command to engage, Officer Eldridge testified, "That he would engage with a suspect, yes." Ex. 5, 62:22–63:6.[4]

After a few seconds, Officer Eldridge entered the apartment; rounding the corner, he observed that his K-9 had engaged the Plaintiff, who was sitting on the floor inside the apartment. Ex. 4 at 3; Ex. 5, 64:3–11; Second Am. Compl. ¶ 20. Officer Eldridge wrote in his police report and initially testified that, at the time he saw Mr. Harper peer around the corner, he was not aware that anyone else was in the apartment. Ex. 4 at 3 ("[M]y K9 had engaged on a second person that I was unaware of being in the apartment."); Ex. 5, 61:5–17 (Q. "At that point when you saw, you know, a male's head, were you aware – at that moment were you aware if

---

[4] The Plaintiff argues that there is no evidence that approval was sought before the K-9 was used, noting the "Request K9 Usage" call that was registered *after* the call to EMS to attend to the Plaintiff's wounds. *See* Ex. 2 at 7. However, the evidence she cites for such a requirement is Officer Wakeley's testimony that use of the K-9 was within Officer Eldridge's discretion: "Yeah, I don't want to speak out of policy, the policy that he would have, but I do know it would be his discretion based on his training is the best answer I could give." Ex. 1, 57:2–8. As a result, it is unclear on the summary judgment record what the significance is of the "Request K9 Usage" call.

there was anyone else in the unit?" A. "I was not."). However, he later testified that he was aware that there were two people in the apartment once Mr. Harper appeared near the entrance. Ex. 5, 88:24–89:16. Officer Wakeley testified that he knew there were two individuals in the apartment when Mr. Harper appeared near the front entrance: "[T]he initial suspect was a female, so now we have two that are involved, a male that we did not know that's in there and then now we know, okay, the female was obviously seen going in, now we have a male that's showing himself to us so . . . ." Ex. 1, 54:6–16.

Officer Eldridge and the third officer approached the Plaintiff; the K-9 had engaged the Plaintiff's right leg. Ex. 4 at 3–4; Ex. 2 at 4. Meanwhile, Officer Wakeley, who observed the K-9 engaged with the Plaintiff, and the fourth officer took positions to watch the bedroom and the hallway. Ex. 4 at 3; *see also* Ex. 1, 64:8–13; Ex. 2 at 4; Ex. 3 at ¶ 3. The Plaintiff was striking the K-9 in the face and yelling for an officer to get the dog. Ex. 2 at 4; Ex. 3 at ¶ 3; Ex. 4 at 4; *see also* Ex. 5, 64:3–11. Officer Eldridge approached the K-9, gained control of his leash, ordered the Plaintiff to stop fighting the K-9, and then gave the K-9 the release command. Ex. 2 at 4; Ex. 4 at 4; Ex. 5, 70:9–11, 71:6–14. Officer Eldridge observed the Plaintiff's fingers in the K-9's eyes and ordered her to let go of the dog; she refused. Ex. 4 at 4; *see also* Ex. 2 at 4. When the Plaintiff finally let go, the K-9 released her leg. Ex. 4 at 4. The Plaintiff then swung at the K-9 with her right arm, and the K-9 engaged her right arm in the elbow area. *Id.* Officer Eldridge repeatedly told the Plaintiff to stop fighting; when she did, the K-9 released her. *Id.*

The Plaintiff did not take a swing at any of the police officers, and she did not attempt to flee the scene. Ex. 1, 63:2–18, 71:22–24; Ex. 5, 68:12–15. Officer Eldridge testified that the Plaintiff did not physically resist, obstruct, or interfere with any law enforcement officer but that she obstructed or interfered with law enforcement in a nonphysical way by not responding to the

officers' calls to come out of the apartment. Ex. 5, 81:4–13. No weapons were found on the

Plaintiff or Mr. Harper. Ex. 1, 61:8–14. Officer Wakeley testified that they found nothing

indicating that the Plaintiff was presenting a physical danger to any officer. *Id.* at 61:15–17.

Less than two minutes passed from the time the officers positioned themselves at the

front door of the apartment and requested radio silence to the time EMS was called to treat the

Plaintiff's injuries. Ex. 1, 49:13–22, 79:16–19; Ex. 2 at 6–7.

About two months before these events, there was an incident in which Officer Eldridge's

K-9 bit someone during police work. Ex. 5, 23:22–24:22. Officer Eldridge testified that an

officer with a K-9 partner normally gives three verbal announcements with a few-second pause

in between to listen for a response. Ex. 5, 40:11–22. He uses a standard announcement, spoken in

either one of two ways: "Crown Point Police Department canine unit, come out with your hands

up at this time" or "show me your hands." *Id.* 57:12–24. Officer Wakeley testified that signs of

forced entry, broken glass, and the presence of a weapon factor into the assessment of the threat

level, which officers are constantly reassessing. Ex. 1, 26:5–19.

The Plaintiff was charged with Residential Entry (Ind. Code § 35-43-2-1.5), Criminal

Trespass (Ind. Code § 35-43-2-2(5)(B)), Resisting Law Enforcement (Ind. Code § 35-44.1-3-1),

and Battery on Law Enforcement Animal (Ind. Code § 35-46-3-11). Ex. 2 at 3.

## ANALYSIS

The Defendants seek summary judgment on the excessive force claim, the failure to

intervene claim, and the punitive damages request. The Court considers each in turn.

**A.     Fourth Amendment Excessive Force Claim Against Officer Eldridge (Count I)**

The Plaintiff brings an excessive force claim against Officer Eldridge under § 1983,

which provides that "[e]very person who, under color of [state law], subjects, or causes to be

subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that the defendant deprived her of a federal constitutional right and that the defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). Here, the Plaintiff alleges violations of her right under the Fourth Amendment to the United States Constitution to be free from excessive force at two distinct points during the incident: first, when Officer Eldridge released his K-9 into the apartment without knowing who was in the apartment and with no evidence of threats or danger, and second, when Officer Eldridge allegedly failed to disengage the K-9 and allowed the K-9 to continue biting her while she was on the ground.

A claim that a police officer used excessive force during an arrest is governed by the Fourth Amendment's objective reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 388 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012)). The totality of the circumstances considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). The court also "consider[s] 'whether the individual was under arrest or suspected of committing a crime; whether the individual was armed; and whether the person was interfering or attempting to interfere with the officer's duties.'" *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021) (quoting *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015)).

"An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, but that right is circumscribed by the Fourth Amendment's insistence on reasonableness." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 396). "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. Thus, the reasonableness of the use of force must consider the facts "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citation omitted).[5]

Defendant Eldridge asserts the defense of qualified immunity, arguing that he did not violate any clearly established right. Qualified immunity, which protects government officials not only from damages liability but also grants immunity from suit, "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)). Once the defense is raised, the plaintiff

---

[5]The Plaintiff cites Officer Eldridge's deposition testimony confirming that he made social media posts criticizing the Black Lives Matter movement and commenting that a video of a car striking a protester was "oddly satisfying." Ex. 5, 85:4–7, 85:21–24. The objective reasonableness standard is applied "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* Nevertheless, "in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen." *Id.* at 399 n.12; *see, e.g.*, *Alicea*, 815 F.3d at 289–90 (finding summary judgment improper on the Fourth Amendment excessive force claim, in part, because the officer yelled "you like to rob houses, you f***ing punk?" at the suspect before releasing his K-9, reasoning that "if one infers from the statement that rather than making a safety calculation, [the officer] was acting out of retaliation, then his decision to deploy [the K-9] was not reasonable at all").

bears the burden of defeating it. *Smith*, 10 F.4th at 737. Thus, the two questions for a court are whether the plaintiff has shown "that the defendant violated a constitutional right" and "that the constitutional right at issue 'was clearly established at the time of the alleged violation.'" *Fosnight v. Jones*, 41 F.4th 916, 924 (7th Cir. 2022) (quoting *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). A court may address the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009).

Because the Plaintiff alleges two distinct uses of excessive force, the Court considers the qualified immunity defense as to each use of force in turn. *See Turner*, 979 F.3d at 568; *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018); *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."); *Becker v. Elfreich*, 821 F.3d 920, 924 (7th Cir. 2016) (noting that qualified immunity had been granted on the initial release of the K-9 into the house but that the issue on appeal was the separate claim that the officer used excessive force, in part, by allowing the K-9 to continue biting the plaintiff after the plaintiff had surrendered).

1.    *Deploying the K-9 into the Apartment*

The Court finds that there are genuine disputes of material fact for the jury as to whether it was reasonable for Officer Eldridge to release the K-9 into the apartment under all the circumstances and that Officer Eldridge is not entitled to qualified immunity.

a.    Constitutional Violation

The Plaintiff alleges that Officer Eldridge's conduct was objectively unreasonable when he quickly released the K-9 into the apartment without knowing how many people were in the apartment and who was in the apartment. Second Am. Compl. ¶¶ 30–32. In the Motion for Summary Judgment, Officer Eldridge argues that he did not violate a clearly established

constitutional right when he deployed the K-9 "as a suspect was fleeing the scene and/or unknown suspects remained hidden in the apartment and refused to comply with reasonable police instructions and warnings and were resisting arrest." Def. Br. 6, ECF No. 37. In support, Officer Eldridge recites the following facts that he contends were known to him at the time: the officers positioned themselves in front of the open door, and Officer Eldridge made the two announcements of "Police Department K-9 Come Out With Your Hands Up"; Officers Eldridge and Wakeley then observed a male peering around the corner of the wall; Officer Eldridge gave the command to "Show Me Your Hands" two times, but the male quickly fled back into the apartment and out of sight without showing his hands; and Officer Eldridge then deployed his K-9 partner to apprehend the male.

Absent from this factual presentation is the evidence that the officers knew a woman—the Plaintiff—was also present in the apartment at the time Officer Eldridge released the K-9. Mr. Barnes, the maintenance manager, reported in his 911 call that a woman had entered the apartment. At the scene, Mr. Barnes told Officers Eldridge and Wakeley that he had seen a heavyset woman enter the apartment by the back door. However, the officers positioned at the front door of the apartment observed a man, later identified as Mr. Harper, peer around the corner inside the apartment. Officer Wakeley testified that he knew two people were in the apartment based on these facts.[6] Officer Eldridge wrote in his police report and initially testified that, at the time he saw Mr. Harper, he was not aware that anyone else was in the apartment. However, later in his deposition, he testified he knew there were two people in the apartment when he saw Mr. Harper. Based on the evidence of record, a jury could find that a reasonable

---

[6] This testimony from Officer Wakeley appears to contradict the Defendants' reply brief, which states that "[l]aw enforcement officers *Wakeley* and Eldridge were unaware that [the Plaintiff] was in the apartment when [the K-9] was released from his leash." Def. Reply 4, ECF No. 46 (emphasis added).

officer in position at the front door, having seen Mr. Harper, would have recognized the likelihood that a woman was also in the apartment.

Thus, the evidence of record viewed in the light most favorable to the Plaintiff is that, even though Officer Eldridge released the K-9 to engage the fleeing Mr. Harper, Officer Eldridge knew the Plaintiff was also a potential target of the K-9's force. When specifically asked if he reasonably expected the K-9 to engage "Mr. Harper" after giving the K-9 the command to engage, Officer Eldridge testified, "That he would engage with *a suspect*, yes." In other words, Officer Eldridge was aware of the possibility the K-9 might engage someone other than Mr. Harper, which would have included the woman who had entered the apartment by the back door.

The Court turns to whether it was reasonable, under the totality of the circumstances, for Officer Eldridge to release the K-9 into the apartment knowing the Plaintiff was also inside. As an initial matter, the parties dispute the quantum of force used when Officer Eldridge released the K-9 into the apartment. The Plaintiff assumes that the use of the K-9 constituted "deadly force" but offers no law in support.[7] As cited by the Defendants, the Seventh Circuit in *Becker v. Elfreich* found that quantifying the amount of force used by deploying a K-9—that is, whether it is "significant force" or "deadly force"—is a fact-sensitive inquiry based on several considerations, including the training of the dog and how the dog reacted at the scene. 821 F.3d at 925–26. In response to summary judgment, the Plaintiff has identified no evidence on this K-9's training or that would establish that the deployment of this K-9 was a use of deadly force. Based on the evidence before the Court on summary judgment, the Court cannot conclude as a matter of law that Officer Eldridge's use of his K-9 constituted deadly force and proceeds on the

---

[7] Rather, the Plaintiff cites the Supreme Court's holding that an officer may use "deadly force" only to seize a fleeing felon whom the officer has probable cause to believe "poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 11 (1985).

basis that it was a significant force. *See id.* ("There are just too many unknowns for this court to conclude, as a matter of law, that Officer Elfreich's use of Axel constituted deadly force.").

Considering the totality of the circumstances, the Court finds that factual issues preclude summary judgment on the constitutional question of whether it was objectively reasonable for Officer Eldridge to release the K-9 into the apartment knowing that the Plaintiff was in the apartment. As for the severity of the crime the Plaintiff and Mr. Harper were suspected of committing, burglary is a serious crime. However, the officers knew that the apartment was unoccupied, and burglary (Level 5 felony), residential entry (Level 6 felony), and criminal trespass (Level A misdemeanor) are not "crimes of violence" under Indiana sentencing law. *See* Ind. Code § 35-50-1-2 (crime of violence); Ind. Code § 35-43-2-1 (burglary); Ind. Code § 35-43-2-1.5 (residential entry); Ind. Code § 35-43-2-2(b)(5)(B) (criminal trespass).[8] The officers did not see any sign of a forced entry, and there is no evidence of what investigation the officers undertook upon their arrival at the scene of the burglary-in-progress to identify who was in the apartment or to communicate with the woman Mr. Barnes saw enter the apartment.[9]

As for the immediate threat to the safety of the officers or others, there is no evidence that the officers had reason to believe the Plaintiff was armed or posed an immediate threat. And although Mr. Harper fled upon seeing the officers at the door with their guns drawn and being ordered to show his hands, there is no evidence that the officers had reason to believe he posed

---

[8] If the "building or structure" is a "dwelling," then the burglary is a Level 4 felony and thus a crime of violence. *See* Ind. Code §§ 35-43-2-1(1), 35-60-1-2(15). "Dwelling" is defined as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." *Id.* § 35-31.5-2-107.

[9] The Plaintiff argues that she did know she was in the apartment illegally. However, the question is what a reasonable officer at the scene knew, and Mr. Barnes told Officer Eldridge that no one should be in the apartment. *See Sherrod v. Berry*, 856 F.2d 802, 804–05 (7th Cir. 1988) ("When a jury measures the objective reasonableness of an officer's action, it must stand in *his* shoes and judge the reasonableness of his actions based upon the information he possessed and the judgment he exercised in responding to that situation.").

an immediate threat or was armed. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("While it was possible that Ellis carried a concealed weapon, as much as it is possible that every felon might be carrying a weapon, Wynalda had no particular reason to believe that Ellis was armed."); *cf. Davis v. Allen*, No. 21-CV-565, 2023 WL 2914807, at *1, 3 (W.D. Wis. Apr. 12, 2023) (explaining the officer was concerned that the plaintiff might be armed or that there were weapons in the trailer "[i]n light of [the plaintiff's] warrants for crimes involving the use of drugs, a weapon and violence as well as the [resident of the trailer's] prior drug conviction" and finding that the initial decision to release the K-9 into the trailer to search for and detain the plaintiff was reasonable, in part, because the plaintiff may have been armed and dangerous).

In addition, the officers saw no signs of forced entry, and Officer Eldridge saw no signs of broken glass or the presence of a weapon, which would have factored into the police officers' assessment of the threat level. There was daylight throughout the encounter. There is no evidence that, at the time the officers arrived at the apartment complex, this was a rapidly evolving situation that required split second judgments or that other methods would have been insufficient to assess the threat level and remove the suspects from the apartment. Rather, it was not until the seven officers positioned themselves at the front and back doors, Officer Eldridge announced the K-9 presence, and at least two of the four officers at the front door had their guns drawn that Mr. Harper peered around the corner inside the apartment and then fled. The events from the time Officer Eldridge called for radio silence at the front door to when he called for the EMS to treat the Plaintiff's dog-bite wounds was less than two minutes. Notably, Officer Eldridge did not maintain control of the K-9 throughout the incident because he released the leash to allow the K-9 to pursue Mr. Harper.

The parties cite no evidence on the element of the danger to others. While Mr. Barnes was presumably still present at the apartment complex, there is no evidence before the Court that he or anyone else was near the apartment at the time of the police intervention.

As for whether the suspects were actively resisting arrest or attempting to evade arrest by flight or were interfering or attempting to interfere with the officers' duties, Mr. Harper fled after he saw the officers at the front door. However, the Plaintiff was not attempting to flee nor was she actively resisting arrest: she did not swing at any officer, nor did she use physical force to resist, obstruct, or interfere with any law enforcement officer. At most, the Plaintiff was passively resisting by failing to respond to Officer Eldridge's initial two calls to "come out with your hands up." The Seventh Circuit has explained that "[w]illful non-compliance [is] not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.'" *Becker*, 821 F.3d at 927. Here, the use of the K-9 was at least a significant use of force.

Finally, the Court notes that Officer Eldridge cites *Tilson v. City of Elkhart*, 317 F. Supp. 2d 861, 866–67 (N.D. Ind. 2003), to argue that his use of the K-9 was reasonable. However, *Tilson* is not persuasive because the officer released the K-9 to apprehend a driver who was suspected of drunk driving, who refused to stop his car, who fled from his car, and began running toward a house. *Id.* at 867. Here, the Plaintiff was neither actively resisting nor fleeing, and there was no evidence of danger to others.

Viewing the facts in the light most favorable to the Plaintiff and considering the totality of the circumstances, a reasonable jury could determine that it was an unreasonable use of force for Officer Eldridge to release the K-9 into the apartment.

b.    Clearly Established Law

Thus, the Court turns to the qualified immunity inquiry of whether the law clearly established at the time that it was unreasonable for Officer Eldridge to release his K-9, which was trained to engage "a suspect," into the unoccupied apartment to apprehend the fleeing Mr. Harper, who was suspected of a low-level felony, knowing that the Plaintiff, who was also suspected of a low-level felony but who was not fleeing and was at most passively resisting, was in the apartment, and having no reason to suspect that Mr. Harper or the Plaintiff was armed or an immediate threat to the officers or others.

For purposes of qualified immunity, the law is clearly established on an excessive force claim if a plaintiff "identif[ies] a closely analogous case that established a right to be free from the type of force the police officers used on him" or "show[s] that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021) (internal quotation marks and alterations omitted). To defeat the qualified immunity defense, "the burden is on the plaintiff to show that the right claimed to have been violated was clearly established." *Id.* at 640 (quoting *Marshall v. Allen*, 984 F.2d 787, 797 (7th Cir. 1993)). While Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 7–8 (quoting *White*, 580 U.S. at 79). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). The Supreme Court has said that "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive

force, will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

The Plaintiff cites *Keammerer v. Eldridge* for its recognition that "there is clearly established law that allowing a police dog to bite a restrained and non-resisting subject equates to excessive force." No. 2:20-cv-376, 2021 WL 4893585, at *4 (N.D. Ind. Oct. 20, 2021).[10] Recognizing that the *Keammerer* decision was issued after the events in this case, the Plaintiff argues that two published cases relied on by the *Keammerer* court—*Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016), and *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016)—clearly established at the time of the events in this case that no more than minimal force may be used against a non-threatening and non-resisting suspect. The Plaintiff argues that, like the plaintiffs in those cases, she was seized, did not attempt to flee, did not resist, and was not a threat, and thus the cases should have put Officer Eldridge on notice that his conduct was unlawful.[11]

In *Alicea*, the plaintiff burglarized a residence and then fled the police; the police tracked him with a K-9 and found him hiding inside an empty, five-foot deep, above-ground, backyard pool. 815 F.3d at 286. The plaintiff offered evidence (disputed by the defendants) that he surrendered, but the police officer released the K-9, which bit the plaintiff, injuring him. *Id.* Overturning the district court's finding that the use of force was reasonable and that the officer was entitled to qualified immunity, the Seventh Circuit reasoned, in part, that "the sole fact a suspect has resisted arrest before cannot justify disregarding his surrender in deciding whether

---

[10] Officer Eldridge and his K-9 Bandit were the officer and K-9 in *Keammerer*.

[11] The court also relied on several other cases identified by the plaintiff that should have put the defendants on notice of their allegedly unlawful conduct when faced with a non-threatening, non-resisting suspect. *Keammerer*, 2021 WL 4893585, at *3 (citing *Bey v. Cimarossa*, 202 F.3d 272 (7th Cir. 2000) (unpublished); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Byrd v. Brishke*, 466 F.2d 6, 10 (7th Cir. 1972); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Stone v. Porter Cnty. Sheriff's Dep't*, No. 2:14-cv-287, 2017 WL 4357453 (N.D. Ind. Sept. 28, 2017); *McFerson v. P.O. Brian Gilden & Gary*, No. 2:16-cv-186, 2020 WL 7642352 (N.D. Ind. Dec. 23, 2020)).

and how to use force," *id.* at 289 (citation omitted), and that "[c]ommanding a dog to attack a suspect who is already complying with orders clearly violates the principles set forth" in previous cases, *id.* at 292 (citations omitted). Thus, the court in *Alicea* found it "clearly established that using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." *Alicea*, 815 F.3d at 292.

In *Becker*, the Seventh Circuit reversed summary judgment for the officer on whether the officer used excessive force in allowing his K-9 to bite an arrestee after the arrestee "had surrendered peacefully and without resistance." 821 F.3d at 927. The police arrived at the plaintiff's mother's house to execute a warrant for his arrest. *Id.* at 923. As the plaintiff was coming down the stairs, the police officer released his K-9, and the K-9 engaged the plaintiff three steps from the bottom by biting his ankle. *Id.* at 923–24 (on appeal, the plaintiff did not challenge the initial release of the K-9, for which qualified immunity had been granted). Although the plaintiff had his hands on his head and shouted for the officer to call off the dog, the officer wrestled the plaintiff down the stairs to the ground and allowed the dog to continue biting the plaintiff. *Id.* at 924. The court found that, even if the plaintiff had heard the officer's command to go to the ground, "[w]illful non-compliance [is] not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.'" *Id.* at 927.

The decisions in *Alicea* and *Becker* establish that an officer cannot use more than minimal force against a non-threatening and passively resisting suspect. Although the Plaintiff did not respond to Officer Eldridge's two commands to "come out with your hands up," it is unclear from the facts of record whether she had sufficient time to respond before Mr. Harper appeared near the entrance of the apartment, prompting Office Eldridge to release the K-9 without further warning. On the facts viewed in the light most favorable to the Plaintiff, the

Plaintiff was, at most, passively resisting by not responding. Based on *Alicea* and *Becker*, the officers at the scene were on notice that no more than minimal force could be used against the Plaintiff. Accordingly, Officer Eldridge is not entitled to qualified immunity on the Plaintiff's Fourth Amendment excessive force claim based on releasing the K-9 into the apartment, and the Court denies the motion for summary judgment on this excessive force claim in Count I.

2.      *Disengaging the K-9 from the Plaintiff*

The Plaintiff also alleges that she was subjected to excessive force in violation of the Fourth Amendment when Officer Eldridge failed to pull the K-9 off her, either physically by its leash or verbally by commands, while she was on the ground being attacked by the K-9. Second Am. Compl. ¶¶ 33–34. For this claim, the undisputed evidence of record establishes that there was no unreasonable use of force and thus no constitutional violation. Upon entering the apartment, Officer Eldridge observed his K-9 engaged with the Plaintiff and observed the Plaintiff striking the K-9. Officer Eldridge took control of the K-9's leash, ordered the Plaintiff to stop hitting the K-9, and gave the release command to the K-9. When the Plaintiff let go of the K-9's head, the K-9 released her leg, but when she swung at the K-9 with her right arm, the K-9 engaged her right arm near the elbow. Officer Eldridge repeatedly ordered the Plaintiff to stop striking the K-9, and when she stopped, the K-9 released her.

The evidence shows that Officer Eldridge took reasonable steps to disengage the K-9 by giving the release command after securing the K-9's leash and commanding the Plaintiff to stop hitting the K-9. From that point, any delay in the K-9 releasing the Plaintiff was caused by the Plaintiff continuing to hit the K-9. Once the Plaintiff stopped hitting the K-9, the K-9 released her. The Plaintiff has offered no evidence to the contrary. *Cf. Becker*, 821 F.3d at 924 (noting the dispute of fact as to whether the officer gave the dog a command to release). Nor has the Plaintiff

18

offered any evidence or law to show or infer that Officer Eldridge failed to disengage the K-9 as soon as reasonably possible or that he did not act reasonably under the circumstances.

Because there was no constitutional violation, the Court grants summary judgment for Officer Eldridge on this second claim in Count I that he was unreasonable in his efforts to disengage the K-9 from the Plaintiff. As a result, the Court does not reach the qualified immunity analysis for this use of force.

**B.      Failure to Intervene Claim Against Officer Wakeley (Count II)**

The Plaintiff alleges that Officer Wakeley "had an opportunity to intervene in the force used and the mauling of the Plaintiff but refrained." Second Am. Compl. ¶ 37. As with the excessive force claim, the Plaintiff brings this failure to intervene claim based on the two uses of force—first, when Officer Eldridge released the K-9 into the apartment and, second, when the K-9 was biting the Plaintiff. To succeed on a failure to intervene claim, a plaintiff must show that the officer "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)); *Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (same). "A realistic opportunity to intervene may exist if an officer could have 'called for a backup, called for help, or at least cautioned [the officer] to stop.'" *Stewardson*, 43 F.4th at 736 (same). Whether there was a realistic opportunity to intervene "is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)).

For the first alleged use of excessive force when Officer Eldridge released the K-9 into the apartment, there is sufficient evidence, as found in the previous section, for a reasonable jury to find an unconstitutional use of force. Officer Wakeley testified that he knew a woman was in

the apartment, and thus he, too, would have been on notice that the release of the K-9 to engage the Plaintiff as a suspect who was at most passively resisting was an unreasonable use of force. Whether Officer Wakeley had a realistic opportunity to prevent Officer Eldridge from releasing the K-9 is a question of fact for the jury. Officer Wakeley was at the open front door with Officer Eldridge and observed the same events unfolding. Although the entire incident took less than two minutes from the time the officers called in radio silence at the front door to when EMS was called to treat the Plaintiff's bite wounds, it is not clear from the record that it was unrealistic for Officer Wakeley to have intervened to prevent Officer Eldridge from releasing the K-9 into the apartment. Notably, Officer Wakeley does not argue that he did not have a realistic opportunity to intervene. Therefore, the Court denies the motion for summary judgment on the failure to intervene claim against Officer Wakeley based on the release of the K-9 into the apartment.

For the second alleged use of excessive force based on the K-9 biting the Plaintiff, there was no "constitutionally impermissible failure to intervene" because, as set forth in the previous section, Officer Eldridge did not violate the Plaintiff's constitutional rights in the steps he took to disengage the K-9 from the Plaintiff. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("[T]here was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention."). Therefore, the Court grants summary judgment on the failure to intervene claim against Officer Wakeley based on the dog continuing to bite the Plaintiff.

Accordingly, the Court denies summary judgment for Officer Wakeley on the failure to intervene claim in Count II as to the release of the K-9 into the apartment but grants summary judgment for Officer Wakeley on the failure to intervene claim in Count II related to disengaging the K-9 from biting the Plaintiff.

20

C.    Punitive Damages

The Defendants argue that the punitive damages sought on both Counts I and II are not

recoverable against governmental entities and their employees in their official capacities. It is

true that an official capacity claim against an individual defendant under § 1983 "must look to

the government entity itself" to collect an award of damages; and punitive damages are not

available against the governmental entity. *Graham*, 473 U.S. at 166, 167 n.13 (citing *Newport v.*

*Fact Concerts, Inc.*, 453 U.S. 247 (1985)). However, for a personal capacity claim under § 1983

against an individual defendant, such as the Plaintiff's claims in this case, "an award of damages

. . . can be executed only against the official's personal assets." *Id.* at 166; *see Smith v. Doherty*,

767 F. Supp. 925, 927 (N.D. Ill. 1991) (citing *Henry v. Farmer City State Bank*, 808 F.2d 1228,

1237 (7th Cir. 1986)).[12] And a plaintiff can collect punitive damages from the employee

personally. *Id.* at 167 n.13 (citing *Smith v. Wade*, 461 U.S. 30 (1983)).

Indiana law allows a governmental entity to indemnify a public employee acting within

the scope of employment who is subject to personal civil liability for punitive damages on a

federal civil rights claim:

> If a present or former public employee . . . is or could be subject to personal civil
> liability for a loss occurring because of a noncriminal act or omission within the
> scope of the public employee's employment which violates the civil rights laws of
> the United States, the governmental entity (when the governmental entity defends
> or has the opportunity to defend the public employee) shall, subject to IC 34-13-3-
> 4, IC 34-13-3-14, IC 34-13-3-15, and IC 34-13-3-16, pay:
>    (1) any judgment (other than for punitive damages) of the claim or suit; or
>    (2) any judgment for punitive damages, compromise, or settlement of the claim
>    or suit if:
>       . . .
>       (B) the governing body of the political subdivision, in the case of a claim or
>       suit against an employee of a political subdivision;

---

[12] "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official,
acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166.

> determines that paying the judgment for punitive damages, compromise, or settlement is in the best interest of the governmental entity. The governmental entity shall also pay all costs and fees incurred by or on behalf of a public employee in defense of the claim or suit.

Ind. Code § 34-13-4-1.

The Plaintiff has sued Officers Eldridge and Wakeley "individually" under § 1983, meaning they are being sued in their personal capacities and are subject to "personal civil liability." It is uncontested that the officers were acting within the "scope of their employment" and are alleged to have "violated the civil rights law of the United States." Thus, the City of Crown Point will determine whether to pay any judgment for punitive damages that a jury may award. Accordingly, the Court denies the motion for summary judgment on punitive damages.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS in part and DENIES in part the Defendants' Motion for Summary Judgment [ECF No. 36], (1) denying summary judgment on the excessive force claim in Count I against Officer Eldridge and the failure to intervene claim in Count II against Officer Wakeley based on the reasonableness of Officer Eldridge releasing the K-9 into the apartment and (2) granting summary judgment on the same claims based on the reasonableness of the effort to disengage the K-9 from the Plaintiff. This matter will be set for a scheduling conference by separate order.

SO ORDERED on August 30, 2023.

 s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT